# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 10-62 (DSD/JJK) |
| Plaintiff, | |
| v. | **ORDER AND REPORT AND RECOMMENDATION** |
| 1. Benjamin Garduwar Karbedeh,<br>2. Timothy Sewro Boe, and<br>3. Sylvester Richards Gayekpar, | |
| Defendants. | |

Jeffrey S. Paulsen, Esq., Assistant United States Attorney, counsel for Plaintiff.

Bruce M. Rivers, Esq., Rivers & Associates PA, counsel for Defendant Karbedeh.

Robert D. Richman, Esq.; and Patrick L. Cotter, Esq., Cotter Law Office, PLLC, counsel for Defendant Boe.

Rick E. Mattox, Esq., Mattox Law Office, counsel for Defendant Gayekpar.

# INTRODUCTION

This matter has been referred to this Court for a Report and

Recommendation pursuant to 28 U.S.C. § 636 and Dist. Minn. Loc. R. 72.1 on

the following pretrial motions:

<u>Defendant (1) Benjamin Garduwar Karbedeh</u>
- Defendant's Pretrial Motion for Severance of Defendants (Doc. No. 69),
- Defendant's Pretrial Motion to Suppress Evidence (Doc. No. 70), and
- Defendant's Pretrial Motion to Suppress Statements, Admissions, and Answers (Doc. No. 72).

<u>Defendant (2) Timothy Sewro Boe</u>
- Motion for Relief from Prejudicial Joinder (Doc. No. 111),
- Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 112), and
- Defendant's Pretrial Motion for Suppression of All Statements (Doc. No. 115).

<u>Defendant (3) Sylvester Richards Gayekpar</u>
- Motion to Suppress Evidence of Pre-Trial Identification and In-Court Identification of the Defendant (Doc. No. 46),
- Motion for Severance (Doc. No. 49), and
- Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 50).

On July 14, 2010, this Court held a criminal-motions hearing at which the following witnesses testified for the Government: Michael Olson, Kal Anthony Bedford, and Lawrence Chung Propes. This court received four exhibits from the Government, including two search warrants and two signed waiver-of-rights forms. This Court also received one exhibit on behalf of Defendant Boe, which is a form indicating Boe's refusal to provide a written statement.

Following the hearing, the Court established a post-hearing briefing schedule to obtain the parties written arguments regarding the above pretrial motions and seeking clarification on certain issues that may have been rendered moot by agreement. Each Defendant filed a post-hearing memorandum (Doc. No. 137, Def. Karbedeh's Mem. of Law in Supp. of Mot. to Suppress ("Def. Karbedeh's Mem."); Doc. No. 140, Def. Timothy Boe's Mem. in Supp. of Mots. to Suppress Evidence ("Def. Boe's Mem."); Doc. No. 138, Def. Gayekpar's Mot. Hr'g Mem. ("Def. Gayekpar's Mem.")). The Government filed a response to these submissions. (Doc. No. 142, Consolidate Resp. of the United States to

Defs.' Post-Hr'g Mem. in Supp. of their Mots. to Suppress ("Gov't's Resp.").)  For the reasons that follow, this Court denies some of the motions listed above as moot and recommends that the remaining motions be denied.

## BACKGROUND

### I.    The Charges

The Government has charged Defendants Karbedeh and Boe with three counts each of Conspiracy to Possess Altered Currency with Intent to Defraud in violation of 18 U.S.C. § 472, and it has charged Defendant Gayekpar with one count of the same offense.  (Doc. No. 30.)  Specifically, the Government accuses Defendants of engaging in a variation of a fraudulent scheme that is sometimes referred to as a "black money scam."  (*Id.*; Doc. No. 136, Tr. of Proceedings (Mots. Hr'g) ("Tr.") 18-19.)  Typically, a "black-money scam" is a confidence scheme in which the perpetrators find a person looking to earn more money and convince the victim that they have a solution or chemical that can be placed on construction-like paper, turning it into genuine currency.  (*Id.* at 18.) Occasionally, the perpetrators represent that they have smuggled money into the country from outside the United States, but to get it into the United States, they had to cover it in a chemical to avoid detection when bringing it into the country. (*Id.*)  Thus, to get access to the money, they have to purchase a very expensive chemical to wash off the substance that was originally used to conceal it.  (*Id.*) The perpetrators defraud the victim by convincing him or her that they cannot afford this expensive chemical and must obtain it from special suppliers.  If the

victim is willing to pay for the chemical, they offer to provide him with a substantial sum from the money restored by the chemical. (*Id.* at 18-19.)

Here, the Government alleges that Defendants engaged in a variation on this scheme; instead of asking the alleged victim for money to purchase a solution to clean blackened bills, Defendants allegedly said that they could double any amount of money the victim could bring to them. (Tr. 59-60.) The Government accuses Defendants of conspiring to defraud an individual by demonstrating the following process: they would place a genuine bill between two blackened pieces of paper; they would then apply a reddish liquid on the blackened pieces of paper; they would then wrap the paper and genuine bill in aluminum foil and brown tape; next, they would apply pressure for a period of time; then, they would remove the pieces of blackened paper and the genuine bill from the foil and tape wrapping; and finally, they would place the blackened pieces of paper in a cup containing some liquid, which would purportedly transform the pieces of paper into two "genuine" bills. (*See id.* at 60-61.)

## II.    The Investigation

Agents with the United States Secret Service investigated the conduct alleged in this matter with Hennepin County law-enforcement officers. (Tr. 11, 54, 62, 64.) As it relates to the motions relevant to this Report and Recommendation, the investigation that led to the charges in the Indictment took place primarily between February 2, 2010, and February 18, 2010. (*See id.* at 63.) On February 2, 2010, Detective Brady Switzer of the Hennepin County

Violent Offenders' Task Force contacted Special Agent Lawrence Propes of the Secret Service about a suspected black-money scam that Detective Switzer heard about through a confidential informant.  (*Id.* at 63, 67-68, 73.)  Around that time, the informant had a chance encounter with Defendant Karbedeh.  (*Id.* at 78.)  In that encounter, Karbedeh gave the informant some money and proposed some sort of a transaction, which the informant relayed to Detective Switzer.  (*Id.*)  Agent Propes was not certain why Detective Switzer contacted him about this matter, but Agent Propes indicated that he had previously worked an investigation dealing with a "Nigerian black-money case" in 2005.  (*Id.* at 73-74, 78.)  Agent Propes understood that Detective Switzer was acting as the informant's "handler" and testified that it was his understanding that the informant had previous problems with law enforcement and was attempting to "work off some prior conviction."  (Tr. 67-68.)

Agent Propes talked to Detective Switzer at that time about using the informant to make a deal.  (*Id.* at 73.)  Agent Propes did not offer any type of assistance to the informant in exchange for working on the investigation, but Agent Propes did not know whether Detective Switzer had given the informant any consideration in exchange for his cooperation.  (*Id.* at 68, 69.)  Detective Switzer told Agent Propes that the informant had worked with the Hennepin County Violent Offenders' Task Force on numerous cases and was very reliable.  (*Id.* at 71.)

On February 3, 2010, Agent Propes had a conversation with the informant and Detective Switzer in Minneapolis at the Hennepin County Violent Offenders' Task Force office across from the federal courthouse. (*Id.* at 72, 79.) Because Agent Propes and Detective Switzer thought that the plan proposed to the informant might be a "spin on the typical black-money scheme," they attempted to "figure it out" by having the informant wear a wire. (*Id.* at 79.) When Agent Propes proposed that the informant work "basically undercover" to further the investigation by wearing the wire, the informant agreed to do so. (Tr. 80.) The informant "never spoke of not wanting to or not [being] willing to assist." (*Id.* at 80-81.) And when it came time to put a wire on the informant, Agent Propes did not notice any objections from the informant. (*Id.* at 81.)

Later on February 3, 2010, the informant met Defendants Karbedeh and Boe in a hotel room at the Ramada Hotel in Richfield, Minnesota. (*Id.* at 60.) The hotel room at the Ramada was a "government-rented hotel room," and the informant's meeting with Karbedeh and Boe was audio-taped. (*Id.* at 62.) Before entering the hotel for the meeting, the informant had consented to the tape-recording of this meeting, and Detective Switzer put a body wire on the informant. (Tr. 62-63.) During the meeting, Karbedeh and Boe allegedly demonstrated the variant of the black-money scam described above using a $100 bill placed between two blackened pieces of paper, *see* discussion *supra* p. 4. (*Id.* at 60-61.) According to Agent Propes, the demonstration was designed to convince the informant that because the process worked with the single $100

bill, the informant should bring $50,000 in cash $100 bills with which to repeat the process.  (*Id.* at 61.)

On February 11, 2010, the informant again met with Agents Propes and Detective Switzer in the Hennepin County Violent Offenders' Task Force's office. (*Id.* at 75.)   Detective Switzer explained to the informant what was going to take place the informant's meeting with Karbedeh and Boe later that day, the informant agreed to it, and Detective Switzer placed the body wire onto the informant.  (*Id.* at 63, 76.)  Later that day, the informant met with Karbedeh and Boe in the informant's vehicle in the parking lot of a Perkins restaurant in Minneapolis.  (*Id.* at 63.)  There is an audio recording of this meeting as well. (Tr. 63.)  During this meeting, Karbedeh, Boe, and the informant discussed setting up a deal for February 18, 2010.  (*Id.* at 63, 75.)  The informant was supposed to bring the $50,000 and a safe to a hotel somewhere near the Minneapolis airport.  (*Id.* at 75.)

The informant met with Karbedeh and Boe on February 18, 2010.  (*Id.*) Prior to that meeting, the informant met with Agent Propes and Detective Switzer, and Detective Switzer told the informant what would likely take place.  The informant agreed to go through with the meeting, and Switzer placed a wire on the informant's body.  (*Id.* at 63, 76.)  Agent Propes arranged for the Government to provide the informant with $50,000, all in $100 bills, to bring with him to a room in the Comfort Inn Hotel in Bloomington, Minnesota, which was rented by the Hennepin County Violent Offenders' Task Force, and where Karbedeh and Boe

were to meet with the informant.  (Tr. 61-62.)  In addition to audio-taping, law enforcement also video-taped this meeting, to which the informant also consented.  (Tr. 62, 63-64.)

During the informant's February 18, 2010 meeting with Karbedeh and Boe, agents with the Secret Service and with the Hennepin County Sheriff's Office monitored the events going on inside the room and outside the hotel.  Special Agents Michael Olson and Kal Bedford of the Secret Service were both conducting perimeter surveillance outside the hotel.  (*Id.* at 10, 40.)  According to Agent Olson, Defendants Karbedeh and Boe were in a hotel room with the informant, who had agreed to have his conversations with Karbedeh and Boe recorded.  (*Id.* at 10, 40.)  Agent Olson admitted, however, that he never had direct involvement with the informant and did not actually take part in any electronic surveillance that was taking place; he was simply briefed about the informant's consent prior to the operation.  (*Id.* at 35.)

Meanwhile, in the hotel's parking lot, Defendant Gayekpar waited in a green Toyota.  (Tr. 10, 40.)  At some point, law-enforcement officers with the Hennepin County Sheriff's Office arrested Boe and Karbedeh in the hotel room.  (*Id.* at 11, 40.)  They also arrested Gayekpar outside of the hotel.  (*See id.* at 10.)

III.   **The Post-Arrest Interviews**

A.     **Defendant Boe's Interview**

According to Special Agent Olson, law-enforcement officers from the Hennepin County Sheriff's Office arrested Defendant Boe in the very late

afternoon, near the dinner hour.  (Tr. 11.)  The arresting officers placed plastic restraints on Boe.  (*Id.* at 12.)  Special Agents Brent Knutson and Eric Humbert of the Secret Service transported Boe from the Comfort Inn Hotel in Bloomington to the Secret Service Office in the federal courthouse in Minneapolis.  (*Id.* at 11.)  Agent Olson was not involved in transporting Boe to the Secret Service's office.  (*Id.*)

When Boe arrived at the Secret Service's office in Minneapolis, about an hour after his arrest at the Comfort Inn Hotel, Agents Olson and Knutson removed Boe's plastic restraints and took him to a room to interview him.  (*Id.* at 12.)  The room where the agents interviewed Boe is approximately ten-feet by eighteen-feet.  (*Id.* at 23.)  Agents Olson and Knutson searched Boe's person prior to the interview and found ten pieces of black construction-like paper, which matched other types of black construction paper uncovered during the investigation of this matter, in Boe's right rear pants pocket.  (Tr. 12-13.)  These pieces of black paper were cut to the size of genuine United States currency.  (*Id.* at 13.)

After the agents searched Boe, they began the interview by first explaining that they were federal agents, that Boe was under arrest, that he was in a federal law-enforcement office, and that before they asked him any questions, they needed to read him his rights.  (*Id.*)  Typically, when Agent Olson advises a suspect of his or her rights, he does so using a specific Secret Service form, which is a waiver-and-consent-to-speak form.  (*Id.*; Gov't's Ex. 3.)  Agent Olson

reads the suspect's rights from the form and writes down the suspect's response after each sentence he reads.  (Tr. 14.)  He followed this practice while interviewing Boe.  (*See id.* at 14-16.)

Under the first section of the form, which is entitled "Warning of Rights," the first sentence reads: "You must understand your rights before we ask you any questions."  (*Id.* at 14; Gov't's Ex. 3.)  After this sentence, Agent Olson wrote the word "Yeah," by hand, to indicate that Boe gave that response.  (Tr. 14; Gov't's Ex. 3.)  Boe responded "I understand" to the form's next warning, which says, "You have the right to remain silent."  (Tr. 14; Gov't's Ex. 3.)  Boe then said that he understood the warning that "Anything you say can be used against you in court, or other proceedings."  (Tr. 15; Gov't's Ex. 3.)  Agent Olson next read the warning that says "You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning," and Boe responded, "I understand."  (Tr. 15; Gov't's Ex. 3.)  And finally, Boe responded "Yes" when Agent Olson read the warning that states:

> If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court.  If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time.  You also have the right to stop the questioning at any time until you talk to a lawyer.

(Tr. 15; Gov't's Ex. 3.)  Following these entries on the form is a statement saying, "I have read this statement of my rights and it has been read to me, and I understand what my rights are."  (Tr. 15; Gov't's Ex. 3.)  Defendant Boe signed the document at 6:35 p.m. on February 18, 2010.  (Tr. 15; Gov't's Ex. 3.)

The next portion of the form, which is entitled "Waiver," says:

> I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or force of any kind has been used against me.  I hereby voluntarily and intentionally waive my right to remain silent and my right to have an attorney at this time.  I am willing to make a statement and answer questions.

(Tr. 16; Gov't's Ex. 3.)  Beneath this entry, Boe signed the form again, and the time recorded on the document is 6:36 p.m. on Febrary 18, 2010.  (Tr. 16; Gov't's Ex. 3.)  Agents Olson and Knutson then signed the bottom of the form, which is titled "Certification," to certify that Agent Olson read the form's provisions to Boe, that Boe also read it, and that Boe signed the document in both officers' presence.  (Tr. 16; Gov't's Ex. 3.)

Neither Agent Olson nor Agent Knutson threatened Boe in any way to get Boe to talk to them.  (Tr. 16.)  Agent Olson did not promise anything to Boe.  (*Id.*)  Boe never asked for a lawyer during the interview.  (*Id.*)  And Boe never asked that the agents discontinue the interview.  (*Id.*)  Agent Olson testified that Boe did not appear to be under the influence of any drugs or alcohol or any other mind-altering substances.  (*Id.* at 17.)  Agent Olson described Boe's demeanor during the interview as "very cooperative, very pleasant."  (*Id.*)  At the time, Agent Olson was wearing plainclothes rather than a uniform, and neither he nor Agent Knutson was armed during the interview.  (Tr. 23.)

Agent Olson testified that Boe appeared to understand the English language, but Agent Olson did not recall asking Boe whether English is his first

language.  (*Id.* at16-17,  26.)  Agent Olson testified that Boe spoke English

clearly and there was no language barrier; he was able to understand everything

that Boe said and Boe understood everything that Agent Olson said.  (*Id.* at 26-

27.)

During the interview, Boe made admissions about his knowing involvement

in a scheme to defraud the informant.  (*See id.* at 17.)  The entire interview lasted

about forty-five minutes, and the Secret Service agents involved did not tape the

interview.  (Tr. 17, 18.)  When the interview concluded, Agent Olson asked Boe

whether he would be willing to provide a written statement.  (*Id.* at 17.)  Agent

Olson explained that he wanted to get a written statement in addition to Boe's

oral statement because, after stepping out of the room at some point during the

interview, he spoke with another agent who was interviewing Defendant

Karbedeh, and this other agent told Agent Olson that Karbedeh was pointing the

finger at Boe.  (*Id.* at 31, 37.)  Agent Olson explained this to Boe and told Boe

that he had the opportunity to put in writing what he had stated during the

interview because Karbedeh was providing contradictory information.  (*Id.* at 31.)

Boe had been claiming that Karbedeh was the ringleader of the scheme to

defraud the informant.  (*Id.* at 37.)  Agent Olson denied telling Boe that he would

make things easier on Boe or that Boe would be released if he provided a written

statement.  (Tr. 28.)  Boe declined to provide a written statement.  (*Id.* at 17.)

Therefore, the form entitled "Statement," which is dated February 18, 2010, and

signed by Agent Olson, indicates that "Timothy Boe [r]efused to give a written statement but gave a verbal statement."  (Tr. 29-30; Def. Boe's Ex. 1.)

### B.    Defendant Karbedeh's Interview

As noted above, law-enforcement officers from the Hennepin County Sheriff's Office also arrested Defendant Karbedeh on February 18, 2010, at the Comfort Inn Hotel in Bloomington.  (*Id.* at 40.)  Special Agent Bedford, accompanied by Agent Olson, transported Karbedeh from the Comfort Inn to the Secret Service offices in Minneapolis.  (*Id.* at 40, 48.)  Agent Bedford testified that the transportation took about fifteen to twenty minutes.  (*Id.* at 40.)  Agent Bedford of the Secret Service testified that he did not ask the Hennepin County officers whether Karbedeh had asked any of them for a lawyer.  (*Id.* at 47.)

According to Agent Bedford, Karbedeh tried to initiate conversation with him during the trip to the Minneapolis office.  (*Id.*)  Agent Bedford did not ask him any questions to elicit a response, but Karbedeh said "I know I ****ed up." (Tr. 41.)  Agent Bedford told Karbedeh that he was not going to ask any questions until they arrived at the Minneapolis office.  (*Id.*)

Once they arrived at the Minneapolis office, Agent Bedford removed the white plastic restraints that officers from the Hennepin County Sheriff's Office had placed on Karbedeh.  (*Id.* at 47.)  Agent Bedford and another Secret Service Agent, Eric Humbert, then searched Karbedeh's person.  (*Id.* at 42.)  Agent Bedford recovered two genuine $100 bills from Karbedeh's right rear pants

pocket.  (*Id.*)  One of the bills had a small amount of a black substance on it, but it was clearly a genuine bill.  (*Id.* at 52.)

After the search, Agents Bedford and Humbert then interviewed Karbedeh. (Tr. 41.)  Agent Bedford explained that he began the interview with Karbedeh by reading the standard Secret Service *Miranda* form, which agents both read to the suspect and have the suspect read.  (*Id.* at 42.)  The form is identical to the form Agent Olson read to Defendant Boe.  (*Compare* discussion *supra* p. 10-12, *and* Gov't's Ex. 3, *with*, Gov't's Ex. 4.)  Agent Bedford read every word on the form verbatim, and gave Karbedeh the opportunity to read the form as well.  (Tr. 43.) Agent Bedford testified that he was not certain how long it took Karbedeh to read the form, but he may have looked at it for approximately five minutes.  (*Id.* at 52.) Agent Bedford, however, did not record any responses to the particular rights that are on the form.  (*See* Gov't's Ex. 4.)  At 6:20 p.m. on February 18, 2010, Karbedeh signed the form underneath the portion that reads, "I have read this statement of my rights and it has been read to me, and I understand what my rights are." (Tr. 43; Gov't's Ex. 4.)  At the same time, he also signed the portion of the form indicating that he waived his right to remain silent, his right to have an attorney present, and further indicating that he was willing to make a statement and answer questions.  (Tr. 43; Gov't's Ex. 4.)

According to Agent Bedford, neither he nor Agent Humbert threatened Karbedeh to get him to talk to them.  (Tr. 43.)  They did not promise Karbedeh anything.  (*Id.*)  Karbedeh did not ask for a lawyer or for the interview to be

discontinued at any point.  (*Id.* at 43-44.)  Agent Bedford did not notice anything about Karbedeh that would indicate that he was under the influence of drugs, alcohol, or any other mind-altering substances.  (*Id.* at 44.)  Karbedeh told Agent Bedford that he is a Liberian citizen.  (*Id.* at 45.)  Agent Bedford testified that he did not know what Karbedeh's native language is, but he also stated that Karbedeh appeared to understand the English language.  (*Id.* at 44, 45.)  Agent Bedford did not have a problem understanding Karbedeh and described Karbedeh's accent as "slight."  (*Id.* at 45.)  Agent Bedford admitted that Karbedeh was not free to leave.  (*Id.* at 54.)

At some point during the interview, Agent Bedford talked with Karbedeh about deportation, "in general terms."  (*Id.* at 53.)  Agent Bedford explained that "if [Karbedeh] was arrested federally that [Agent Bedford] would have to advise him that he has the opportunity to contact the Liberian embassy.  But he was not under federal arrest at the time."  (Tr. 53.)  Agent Bedford clarified that he meant that Karbedeh had been arrested by the Hennepin County Sheriff's Office on probable cause, but he had no federal arrest warrant for Karbedeh at that time. (*Id.*)  The agents did not record the interview per Secret Service policy.  (*Id.* at 46.)

The interview lasted approximately one hour, and Karbedeh made admissions about his participation in a scheme to obtain more than $50,000 from the other party in the hotel room, i.e., the informant.  (Tr. 43.)  At the end of the interview, Karbedeh declined to provide a written statement.  (*Id.* at 51.)

Karbedeh did not give a specific reason why he did not want to provide a written statement.  (*Id.*)

## DISCUSSION

### I.  Defendants' Motions for Severance

All three Defendants have filed motions for severance requesting that they be given separate trials.  Two or more defendants may be charged in the same indictment if they are alleged to have participated in the same transaction or series of incidents constituting an offense or offenses.  Fed. R. Crim. P. 8(b).  "There is a preference in the federal system for joint trials of defendants who are indicted together."  *Zafiro v. United States,* 506 U.S. 534. 537 (1993).  Persons charged with conspiracy should generally be tried together and it will rarely be improper for co-conspirators to be tried together.  *United States v. Kindle,* 925 F.2d 272, 277 (8th Cir. 1991); *United States v. Stephenson,* 924 F.2d 753, 761 (8th Cir. 1991), *cert. denied*, 502 U.S. 813 (1991).  The propriety of joinder under Rule 8 is a question of law, though relief from a legally permissible joinder may be obtained as an exercise of discretion on motion for severance due to prejudice, pursuant to Fed. R. Crim. P. 14.  *United States v. Rodgers,* 732 F.2d 625, 628-29 (8th Cir. 1984).  Availability of the Rule 14 remedy permits broad construction of Rule 8 in favor of initial joinder.  *Id.* at 629.

Defendants have been indicted for conspiring with one another to possess altered currency with intent to defraud.  Under these circumstances, the general rule in the federal system is that the co-conspirators should be tried together.

This Court may grant severance of defendants if it appears that a defendant is prejudiced by a joinder of defendants at trial. Fed. R. Crim. P. 14. A court should "grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Here, Defendants have not shown that severance of co-defendants is necessary to avoid a risk of compromising any specific trial right to which each Defendant is entitled or is necessary to prevent the jury from making an unreliable judgment as to the guilt or innocence of each of them.

Defendant Gayekpar argues that the fact that he did not provide a statement to law-enforcement officers entitles him to severance. However, this argument does not implicate a specific trial right and does not explain how the jury would be unlikely to make a reliable judgment about his guilt or innocence. His motion for severance should be denied.

Defendant Karbedeh argues that the jury will not be able to distinguish the acts of each Defendant from his co-defendants, evidence may be introduced by each Defendant that would be inadmissible against other Defendants in a separate trial, and his co-defendants would be likely to provide exculpatory evidence in a separate trial that will not be available in a joint trial. It is not patently apparent, however, that a jury would be unable to distinguish and apply the evidence relating to one defendant from evidence relating to other defendants. And Karbedeh does not sufficiently indicate how any defendant is

prejudiced by joinder with other defendants. He does not identify any specific trial right that will be violated if he is tried with the other Defendants. Therefore, Karbedeh's motion for severance should be denied.

Defendant Boe argues that another Defendant in this matter has a prior conviction, and evidence of such prior conviction will be unfairly prejudicial to him. He also argues that other Defendants have made statements inadmissible against him, but that directly implicate him, which will cause "intractable *Bruton* problems." (Doc. No. 111.) This Court cannot agree with the Government at this time that any Defendant's post-arrest statements that implicate another Defendant can be redacted consistent with *Bruton v. United States*, 391 U.S. 123 (1968), because no such statements have been offered to this Court for *in camera* review. Thus, this Court cannot evaluate whether limiting instructions can be used with respect to any such evidence. Boe's motion for severance should be denied without prejudice. This denial should be without prejudice so that any potential *Bruton* problems can be evaluated upon judicial review of the statements the Government intends to offer and any proposed redactions that could be made.

## II. Defendant Boe's Motion to Suppress Evidence Obtained through Confidential-Informant Recordings

Defendant Boe seeks to suppress any recordings of conversations between himself and the informant used in the investigation of this matter on the ground that the Government has failed to carry its burden to prove that the

informant consented to the recordings.  (Def. Boe's Mem. 1-4.)  Section 2511 of

Title 18 of the United States Code generally prohibits the intentional interception

of communications through electronic means.  *See* 18 U.S.C. § 2511(1).

However, the statute also provides that it is not unlawful for a person acting

under color of law to intercept an oral communication "where such person is a

party to the communication or one of the parties to the communication has given

prior consent to such interception."  18 U.S.C. § 2511(2)(c).  "[W]hen . . . a law

enforcement officer or informant participates in a conversation and records the

conversation without prior judicial authorization, the evidence is admissible."

*United States v. Simmons*, No. 94-1538, 1995 WL 15384, at *2 (8th Cir. 1995)

(unpublished table decision) (citing *United States v. White*, 401 U.S. 745, 751-53

(1971), and *United States v. Jones*, 801 F.2d 304, 215 (8th Cir. 1986)).  In a

monitored conversation involving a consenting party, "[n]o warrant is required

when one participant consents because no interest legitimately protected by the

fourth amendment is involved."  *Jones*, 801 F.2d at 315.  This is so because "a

person engaged in a conversation assumes the risk that another party to the

conversation might choose to divulge or even record the conversation."  *United

States v. Corona-Chavez*, 328 F.3d 974, 981 (8th Cir. 2003).

The Government bears the burden of demonstrating that an informant

consented to participate in the taping of a conversation.  *Id.* at 978; *see United

States v. Tangeman*, 30 F.3d 950, 952 (8th Cir. 1994) (addressing a defendant's

argument that the Government failed to carry its burden to show that an

informant consented to the recording of her conversations with the defendant). "The voluntariness of the consent is examined under the totality of the circumstances." *Id.* "Consent may be express or implied, but in either case, there must be actual consent." *Corona-Chavez*, 328 F.3d at 978.

Boe argues that the Government has not met its burden here because Agent Propes testified that the informant had a handler who controlled the informant and the informant was trying to work off a prior conviction. He points out that Agent Propes could not say what promises of leniency had been made to the informant, what the informant might be getting in return for cooperation, or whether Detective Switzer told the informant he would be subject to adverse consequences if he refused to cooperate. (Def. Boe's Mem. 2-3.)

Perhaps Boe means to imply that the informant likely received some benefit from his cooperation in the investigation and this motivation for his cooperation invalidates any consent the informant gave. However, the fact that an informant benefits from aiding the police in an investigation does not make his consent involuntary. *See United States v. Oslund*, 453 F.3d 1048, 1056-57 (8th Cir. 2006) (noting that even if an informant had received promises of lenient treatment for any charges he faced, it would not necessarily have invalidated the informant's consent); *United States v. Rich*, 518 F.2d 980, 985 (8th Cir. 1979) ("The fact that Walsh became a government informant in exchange for a promise of immunity from prosecution in no way diminishes the voluntariness of his 'consent' to the monitoring of his conversations with the defendants and other

alleged conspirators."); *see also United State v. Kelly*, 708 F.2d 121, 125 (3d Cir.

1983) ("An individual's decision to allow the police to record a . . . conversation . .

. is not necessarily involuntary just because the individual's motives were self-

seeking, or because he harbored expectations of personal benefit.").  Therefore,

the fact that there is some evidence that the informant in this case was

attempting to work off a prior conviction by cooperating with Detective Switzer,

and may have been given other promises of leniency, does not render his

consent to recording conversations with Boe involuntary.

Boe next argues that the Government has failed to meet its burden

because it did not call the informant at the hearing, asserting that the informant is

"the witness who is best able to testify about the circumstances in which he

recorded the conversations."  (Def. Boe's Mem. 4.)  He also asserts that the

evidence at the hearing is otherwise insufficient to show voluntary consent.  But

the fact that the informant did not testify at the hearing on the issue of consent

does not mean that the Government has failed to carry its burden.  *See*

*Tangeman*, 30 F.3d at 951, 952 (noting that the Government produced sufficient

evidence of consent even though the informant did not testify at the suppression

hearing because he died shortly before the defendant was indicted); *United*

*States v. Wanton*, Criminal No. 05-20058, 2006 WL 1657108, at *4 (W.D. Ark.

June 12, 2006) (concluding that "it was not necessary to obtain the testimony of

the informant" where the informant approached law enforcement to cooperate in

exchange for leniency on pending charges, signed forms agreeing to participate,

and "manipulated machinery and devices to ensure that the recordings were made").  And, even in the absence of the informant's testimony, this Court finds that the presence of the wire on the informant's body during three separate meetings with Boe is strong evidence of the informant's voluntary consent to the electronic interceptions at issue.  *See United States v. Burford*, 755 F. Supp. 607, 615 (S.D.N.Y. 1991) (finding that the informant's continuing cooperation with the Government and knowledge of a recording was tantamount to his consent to record conversations he had with the defendant); *cf. United States v. Person*, 427 F. Supp. 2d 894, 907 n.8 (D. Minn. 2006) (finding it highly unlikely that suppression of recordings obtained using an informant would be warranted where the informant had actually worn a wire and no other evidence suggested that the informant had not consented to do so).

Boe argues that *Tangeman* can be distinguished from this case because the informant in *Tangeman* agreed in writing to wear a body microphone.  *See* 30 F.3d at 952.  However, nothing in *Tangeman* or any other case of which this Court is aware, requires such a written agreement for there to be consent within the meaning of 18 U.S.C. § 2511(2)(c).  Rather, the Eighth Circuit makes clear that whether an informant consented to a recording is determined by the totality of the circumstances.  Under the totality of the circumstances, this Court concludes that the Government has met its burden to show that the informant consented to the recording of conversations he had with Boe.  As discussed above, the fact that the informant wore a wire on three separate occasions

suggests that he voluntarily consented to the recordings at issue. Agent Propes testified that the informant was cooperating as part of an agreement with Detective Switzer to "work off some prior conviction," which also suggests that the informant had agreed to become part of the investigation. Agent Propes also testified that Detective Switzer informed him that he had worked with the informant in the past and the informant was reliable. In addition, Agent Propes explained that before each meeting with Defendants Boe and Karbedeh in this matter, he met with the informant and Detective Switzer, they discussed what was going to happen, and Detective Switzer put a wire on the informant's body. This occurred each time without Agent Propes noticing any objection from the informant, and Agent Propes testified that the informant did, in fact, consent. All the evidence in the record suggests that the informant consented to the interceptions at issue. Accordingly, this Court recommends that Defendant Boe's motion to suppress be denied.

## III.    Defendants Boe's Motions to Suppress Statements

Defendant Boe seeks to suppress evidence of statements he made to the Secret Service Agents who interviewed him on February 18, 2010, on the grounds that he did not understand the rights he was abandoning and did not comprehend the consequences of his decision to forego his rights. (Def. Boe's Mem. 5-6.)

There is no dispute that Boe was in custody at the time he made the statements he now seeks to suppress, that he was entitled to a reading of those

rights, and that officers actually read him his rights. Thus, the issue here is whether Boe validly waived those rights. A defendant may waive the rights conveyed in *Miranda* warnings provided the waiver is voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is the Government's burden to show by a preponderance of the evidence that the suspect's waiver meets these standards. *Miranda v. Arizona*, 384 U.S. 436, 473 (1966). Whether a waiver is voluntary, knowing, and intelligent depends on the totality of the circumstances. *Moran*, 475 U.S. at 421. To make a knowing and intelligent waiver, the defendant must have "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Syslo*, 303 F.3d 860, 865 (8th Cir. 2002). Courts look to such factors as the age and education level of the defendant, lack of advice as to constitutional rights, length of detention, "repeated and prolonged nature of questioning," and the use of physical punishment. *Tippitt v. Lockhart*, 859 F.2d 595, 598 (8th Cir. 1988).

Here, Boe argues that he did not make a knowing and intelligent waiver because he did not have full awareness of the nature of his rights and the consequences of his decision to abandon it because he is a Liberian national unfamiliar with the United States criminal justice system and English is not his first language. He suggests that his refusal to provide a written statement after making inculpatory oral statements during the interview shows that he did not

understand that his oral statements could be used against him in court. (Def. Boe's Mem. 6.)

First, this Court addresses Boe's argument regarding his decision not to provide a written statement even though he agreed to speak with Agents Olson and Knutson. This Court does not view this as a sign that his oral statements were made involuntarily. *Cf. Connecticut v. Barrett*, 479 U.S. 523, 530 (1987) (rejecting a defendant's argument that the "distinction . . . between oral and written statements indicates an understanding of the consequences so incomplete that we should deem his limited invocation of the right to counsel effective for all purposes" and noting that "we have never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness") (quotations omitted). There may be "strategic reasons why a defendant willing to speak to police would still refuse to write out his answers to questions . . . ." *Id.* at 530 n.4. Here, there is no evidence that Boe's decision to speak was the product of such a strategic approach, but there is also no evidence that it was the product of any misunderstanding. To the contrary, when Boe was read the warning that "[a]nything you *say* can be used against you in court, or other proceedings" (Tr. 15; Gov't's Ex. 3 (emphasis added)), he responded "I understand that." (Gov't's Ex. 3.) This undercuts Boe's argument that he waived his right to remain silent without awareness of its nature or the consequences of abandoning it. *See United States v. Rohrbach*, 813 F.2d 142, 145 (8th Cir. 1987) (rejecting a defendant's argument that "his refusal to sign a

written statement may indicate that he did not understand that his oral statements could be used against him, despite his having signed a waiver form acknowledging that he understood his rights").

Second, this Court concludes that the Government has shown that Boe's waiver was voluntary, knowing, and intelligent. The Government produced a signed form that indicates Boe understood all of the rights afforded him under *Miranda* and then waived those rights. Boe did not ask for clarification of the rights prior to signing or explain that he did not know what was happening because the discussions were in English. He told Agent Olson that he understood the rights he was read. He also informed Agent Olson that he was waiving those rights. He spoke English during the interview, and Agent Olson had no problem understanding him. As a result there is no evidence that he had a limited ability to read, speak, or understand English. And there is no evidence that Boe had a limited capacity to understand the concepts communicated. He was not questioned for an unreasonably long period and he had only been detained for a short period of time when the interview occurred. There is also no evidence that the officers used any physical punishment or other coercive tactics to procure the waiver. Considering the totality of the circumstances, this Court finds that Boe understood his *Miranda* rights and waived them knowingly and intelligently. *See United States v. Perez*, 200 F.3d 576, 580 (8th Cir. 2000) (finding consent to search voluntary even though English was not the defendant's first language); *United States v. Carrate*, 122 F.3d 666, 670 (8th Cir. 1997)

(finding consent to search voluntary despite defendant's claim of limited ability to speak English). Further, because there is no evidence that Agents Olson and Knutson, or any other law-enforcement officer threatened or otherwise coerced Boe to get him to talk, the Court finds that that Boe's statement was neither involuntary or the product of an overborne will. *See United States v. Gallardo-Marquez*, 253 F.3d 1121, 1123 (8th Cir. 2001) (noting that a statement is involuntary if it "was extracted by threats, violence, or . . . promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired") (quotations omitted).

For the foregoing reasons, this Court recommends that Boe's motion to suppress statements be denied.

## IV.  Defendant Karbedeh's Motion to Suppress Statements

Defendant Karbedeh seeks to suppress evidence of any statements he made during the February 18, 2010 interview conducted by Agents Bedford and Humbert. Specifically, Karbedeh argues that the statements should be suppressed because he was never informed, before or after his arrest on February 18, 2010, of his right to communicate with the Liberian Consulate, and the Liberian Consulate was never informed of his arrest. (Def. Karbedeh's Mem., *passim*.) Karbedeh argues that if he had known of his right to contact the Liberian Consulate, he would have availed himself of that right, and it is likely that the Consulate would have responded in a helpful manner. (*Id.* at 2-3.)

The Vienna Convention provides that government authorities should inform those arrested in a foreign country of the right to communicate with their home country's consulate.  *See Vienna Convention on Consular Relations* art. 36, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 1969 WL 97928.  The Vienna Convention came into force in the United States on December 24, 1969, *see* 21 U.S.T. 77, and the requirement to advise foreign nationals of their right to speak to a member of their consulate is codified in Department of Justice Regulations at 28 C.F.R. § 50.5.

However, it is not clear that the Vienna Treaty creates rights that are privately enforceable in federal courts.  The Eighth Circuit has not recognized an individually-enforceable right under Article 36(b) of the Vienna Convention.  *See United States v. Santos*, 235 F.3d 1105, 1107 (8th Cir. 2000) (declining to address whether such an individual right exists and presuming requirement of prejudice).  And, even if the Treaty does create privately enforceable rights, the Supreme Court has indicated, and every circuit to address the question has determined, that suppression is not the appropriate remedy for violations of Article 36.  *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350 (2006) ("[W]e think it unnecessary to apply the exclusionary rule where other constitutional and statutory protections—many of them already enforced by the exclusionary rule—safeguard the same interests Sanchez-Llamas claims are advanced by Article 26."); *United States v. Minjares-Alvarez*, 264 F.3d 980, 986 (10th Cir. 2001); *United States v. Jimenez-Nava*, 243 F.3d 192, 198-200 (5th Cir. 2001); *United*

*States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 621-22 (7th Cir. 2000); *United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1196 (11th Cir. 2000); *United States v. Lombera-Camorlinga*, 206 F .3d 882, 885 (9th Cir. 2000) (en banc); *United States v. Li*, 206 F.3d 56, 60 (1st Cir. 2000) (en banc).  This is so because the purpose and history of the exclusionary rule and that of the Convention support the determination that the exclusionary rule is an inappropriate remedy for a violation of Article 36.  *See United States v. Rumbo Rosendiz & Manzanares-Valle*, Crim. No. 01-186 (JRT/FLN), Docket No. 53 (D. Minn. Order dated Nov. 26, 2001).

Finally, aside from his conclusory statements that it is highly likely that the Liberian Consulate would have responded helpfully had Karbedeh contacted it, he has not shown that he was prejudiced by the failure to advise him of his rights under the Convention.  *See Santos*, 235 F.3d at 1107 (presuming that there is a requirement of prejudice if there is an individually enforceable right under the Convention).  Thus, even if suppression was an appropriate remedy in certain cases, the suppression of Karbedeh's statements is unwarranted.  *See United States v. Miranda*, 65 F. Supp. 2d 1002, 1006-07 (D. Minn. 1999) (holding that defendant was not entitled to suppression of evidence to remedy an Article 36 violation because he did not demonstrate prejudice).

For these reasons, this Court recommends that Karbedeh's motion to suppress statements be denied.

## V. Defendant Karbedeh's Motion to Suppress Evidence

Defendant Karbedeh raises no argument in his post-hearing memorandum regarding his motion to suppress evidence. Therefore, this Court concludes that the motion has been rendered moot by the parties' agreement as discussed at the hearing. This Court, therefore, denies Karbedeh's suppression motion as moot.

## VI. Gayekpar's Motion to Suppress Pre-Trial Identifications

Defendant Gayekpar moved to suppress evidence of any pre-trial identification of Gayekpar and any in-court identifications of him. The Government asserts that the motion is moot because no photo spreads or show-ups were used to identify Gayekpar. Defendant Gayekpar agrees that the motion is moot. Therefore, the Court denies Gayekpar's motion as moot.

## VII. Gayekpar's Motion to Suppress Evidence

Defendant Gayekpar filed a motion in this matter seeking suppression of any physical evidence obtained on the grounds that two searches of his person, and another search of his automobile, person, property, and luggage, were conducted without warrants and without probable cause. He also argued that suppression was warranted because the Government failed to provide discovery relating to a particular traffic stop and search. (Doc. No. 50.) Pursuant to agreement with the Government, Gayekpar indicated at the hearing and in his post-hearing memorandum that he would not be challenging the legality of any search. Therefore, this Court denies Gayekpar's suppression motion as moot.

# ORDER

Based on the file, and all the records and proceedings therein,

**IT IS HEREBY ORDERED** that

1.      Defendant Gayekpar's Motion to Suppress Evidence of Pre-Trial Identification and In-Court Identification of the Defendant (Doc. No. 46), is **DENIED AS MOOT**;

2.      Defendant Gayekpar's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 50), is **DENIED AS MOOT**; and

3.      Defendant Karbedeh's Pretrial Motion to Suppress Evidence (Doc. No. 70), is **DENIED AS MOOT**.

# RECOMMENDATION

Based on the file, and all the records and proceedings therein,

**IT IS HEREBY RECOMMENDED** that:

1.      Defendant Gayekpar's Motion for Severance (Doc. No. 49), be **DENIED**;

2.      Defendant Karbedeh's Pretrial Motion for Severance of Defendants (Doc. No. 69), be **DENIED**;

3.      Defendant Karbedeh's Pretrial Motion to Suppress Statements, Admissions, and Answers (Doc. No. 72), be **DENIED**;

4.      Defendant Boe's Motion to Sever (Doc. No. 111), be **DENIED WITHOUT PREJUDICE**;

5.    Defendant Boe's Motion to Suppress Evidence Obtained as a Result

of Search and Seizure (Doc. No. 112), be **DENIED**; and

6.    Defendant Boe's Pretrial Motion for Suppression of All Statements

(Doc. No. 115), be **DENIED**.


Date: August 11, 2010

                            *s/ Jeffrey J. Keyes*          
                            JEFFREY J. KEYES
                            United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 25, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.